MADELINE JASMINE, Judge Pro Tempore.
 

 | .¿The defendant, Coldewy Corporation, has appealed a trial court judgment in favor of plaintiffs. The plaintiffs have answered the appeal requesting an increase in the damage award. For the reasons that follow, we affirm.
 

 FACTS
 

 The plaintiff, Terri Nuerge Fantazia, testified that she owns a house in Metairie, Louisiana along with her mother and brother, who are also plaintiffs in this action. Ms. Fantazia testified that a portion of the roof of this house was damaged during Hurricane Katrina causing water to enter the house. The roof needed to be repaired prior to repairing the damage to the interior of the house. In order to have the roof repaired, her brother signed a contract with the defendant, Coldewy Corporation doing business as Landrieu Brothers, to repair the roof for the amount of $10,700.00.
 

 The contract, which was admitted into evidence, provided the following would be performed: (1) remove existing pitch roof and repair roof decking as needed prior to installing the new roof, (2) 197 linear feet of drip edge would be installed, (3) re-flash the chimney, (4) furnish and install new 25 year GAF 3 tab Land 30 pound felt, remove and haul away existing flat roof, two layers, (5) furnish and install new rubber-oid torch down white gravel, (try to build up on two ends), and replace roof decking as needed.
 

 Ms. Fantazia testified that the new roof was installed and Landrieu Brothers was paid in full for this work. After the new roof was installed, the roof leaked in two separate places during a rain storm. Ms. Fantazia testified that she called Landrieu Brothers and left a message on their answer machine to tell them the roof was leaking. Ms. Fantazia’s husband went into the attic and circled the areas where the water was coming through the roof. Lan-drieu Brothers sent a representative out to look at the leaks and work was performed in a different area than Ms. Fantazia felt the leaks originated. The roof continued to leak. Ms. Fantazia called Landrieu Brothers and explained that they did not find the source of the leaks. The same representative was sent to the house and Ms. Fantazia’s husband got on the roof with a hose to show him where the water was coming through the roof. The representative pointed out several things that were wrong with the roof and assured Ms. Fantazia that they would come back and repair them. He also placed roofing cement on the roof. After this visit, Ms. Fantazia testified that the roof was still leaking.
 

 Ms. Fantazia testified that she went to the Landrieu Brother’s office and spoke to the manager. She explained that the representative who had been sent out to the house was not trying hard enough to fix the leaks. She was informed that she had to work with this representative because that was his job. Later, a meeting was set up wherein Greg Landrieu came to the house to look at the roof. Mr. Landrieu told Ms. Fantazia that a sealant needed to be put on the flat roof and that more shingles needed to be put on the roof and that he would send someone out to perform these tasks.
 

 |4Ms. Fantazia explained that at that point she became concerned about the
 
 *41
 
 quality of the roof, so she contacted an attorney. At the attorney’s suggestion, she contacted Patrick Vicknair to inspect the roof.
 

 On cross-examination, Ms. Fantazia explained that she lives in Texas and her mother lives with her brother in Jefferson Parish. Neither were available to testify for this matter. She testified that there was no damage to the interior of the house due to leaking of the roof installed by Landrieu Brothers. Ms. Fantazia testified that she did not see the roof leaking in March of 2007, nor did she know if it was leaking at the time of trial. She did not have the roof repaired by someone else. She also admitted that there was one leak in the roof caused by a squirrel eating a stack on the roof over the bathroom.
 

 Patrick Vicknair was accepted by the court as an expert in roof damage. Mr. Vicknair testified that he examined the roof on the plaintiffs’ house, took pictures, and wrote up a document explaining what it would cost to replace the roof. Mr. Vicknair testified that it was raining when he examined the roof and it was leaking. Using the pictures that were admitted into evidence, Mr. Vicknair explained the deficiencies in the roof. He explained that the rubber roid flat roof was not properly torched down and is curling. He depicted the area on the pictures where the entire edge of the flat roof is curled up. He showed an area where the shingles are also curled up. Mr. Vicknair testified that there is another roof under the new roof and the water is leaking through the new roof and going to the other roof and leaking down the back wall. He explained that this is why Ms. Fantazia does not see the leaks. Mr. Vicknair explained that the flat roof is not installed properly. He further testified that the shingles on the shingled roof are not installed according to the manufacturer’s specifications. Mr. Vick-nair explained that since the roof is improperly installed, there is no manufacturer’s warranty. In Mr. LVicknair’s opinion, the existing flat roof was not removed prior to installing the new flat roof. Mr. Vicknair explained that there are waves in the flat roof which will allow water to get under the roof and deteriorate the wood. Mr. Vicknair opined that the chimney was not re-flashed as provided for in the contract. Using a picture of the area where the flat roof ties into the sloped roof, Mr. Vicknair testified that the flashing was not properly installed. He explained that the siding was not removed in order to put flashing underneath. Instead, roofing cement was applied on top of this area, which, in Mr. Vicknair’s opinion, will crack and leak within three years. He further testified that when flashing is placed on top of shingles, water will go under the flashing and down the walls. This will cause the walls to rot, creating a termite trap.
 

 In sum, Mr. Vicknair testified that the back gable and flat roof were installed improperly and these entire portions of the roof have to be removed and replaced. He testified that the “front gable is o.k.” Mr. Vicknair also stated that any wind damage to this roof would not be covered by the homeowner’s insurance policy because the roof is not installed properly.
 

 Greg Landrieu testified that he is the owner of Landrieu Brothers, which has performed roofing work since 1983. Documents depicting the material ordered and a sketch of the roof were introduced during his testimony. One document indicated there was a change order wherein more expensive material was used because the original material was not available. The plaintiffs agreed to pay for this change. Mr. Landrieu testified that he went to the house to look at the roof after Ms. Fanta-zia accused him of not installing a roof
 
 *42
 
 they were paid to install. He showed Ms. Fantazia that the roof was replaced and pointed out the damage caused by squirrels. He testified that a flat roof has to cure for 60 to 90 days before the sealant can be applied. Mr. Landrieu explained that a document dated [ (¡September 7, 2006 depicts the work performed by Landrieu Brothers’ representative, Mr. Bill Forbes who went to the house to address Ms. Fantazia’s concerns. This document states:
 

 (1) silver coat (3) flat roofs
 

 (2) change (2) lead caps eaten by squirrels and wrap mesh/wire around caps so squirrels won’t eat anymore
 

 (3) install electric flange properly under shingles
 

 (4) seal left side where flat roof meets shingles
 

 (5) torch flat roof material on right side over edge of roof, make it look like left side, roof is leaking in 2 places at this location.
 

 Mr. Landrieu testified that it is very common for the edge of flat roofs to “peel up” and that the entii-e roof did not need to be replaced. He testified that the roof was torched properly. He further testified that the transition between the slope roof and flat roof was sealed and the flashing was properly installed.
 

 Mr. Landrieu testified that his company was not allowed back on the property to remedy the problems in the roof. He did not agree that the there was no manufacturer’s warranty on the roof. He stated that the shingles and the flat roof were installed according to the manufacturer’s specifications. He stated that any repairs that needed to be performed on the roof could be done for minimal cost. Mr. Lan-drieu testified that this roof could be replaced for $1.50 to $2.00 per square foot for materials and labor and that the roof was 1400 square feet.
 

 Mr. Landrieu further testified that he was on the property on three to four occasions and did not see any leaks in the roof.
 

 In response to Mr. Vicknair’s testimony, Mr. Landrieu disagreed that the siding had to be removed to place flashing in the transition from the slope to flat roof. He further pointed out that he did not contract to take the siding off. He reviewed the pictures taken by Mr. Vicknair and stated that the roof was “put down pretty well.”
 

 |7On cross-examination, Mr. Landiieu testified that although he has no hands on experience in installing roofs, he has taken classes and has knowledge regarding installation. He agreed that if a roof is not installed properly, problems may not be visible for years. With regards to the drip edge, he testified that it was installed properly and there was no other way to avoid it being higher than the other portion of the roof.
 

 Upon questioning by the court, Mr. Lan-drieu testified that the contract was to remove the two layers of flat roof and he assumed this was done. He stated that the charge for the flat roof was $4.25 per square foot but now the cost has increased to $5.50 per square foot and the cost to replace the back gable was $2.50 to $3.00 per square foot. He testified that when he inspected the roof to address Ms. Fanta-zia’s concerns, the roof did not appear as it did in the pictures taken by Mr. Vicknair. He specifically noted that the edges were not curled up.
 

 Timothy Hoggart testified that he had worked for Landrieu Brothers for fifteen years, installing over 200 roofs. His job was to supervise the crews and inspect the jobs. Mr. Hoggart testified that this job was unique because of the transition from the slope roof to the flat roof. He had never seen a roof designed like this. For
 
 *43
 
 that reason, an experienced crew, headed by a longtime employee, Mr. Seline, was assigned to do this installation. Mr. Hog-gart testified that he was “almost certain” that the underlying roof was removed pri- or to installing the new roof. He further testified that there were no curled edges when he inspected the roof. He testified that it was “pure speculation” that the roof was installed improperly. Mr. Hoggart testified that the changes in the weather caused the roof to curl and lift up. He also stated the weather was the reason for the waves in the flat roof. With regard to the sealant that was not placed on the roof, Mr. Hoggart 18testified that the roof has to cure, so the coating could have been applied in May, June, or July.
 

 The court questioned Mr. Hoggart about the proper way to install flashing, inquiring whether shingles should be placed underneath or on top of flashing. Mr. Hog-gart responded “it depends.”
 

 At the conclusion of trial, the court found the flat roof was not torched down properly and was improperly installed causing it to be wavy. The court also found the roof on the back gable of the house was not put on properly. The court awarded $6,000.00 to replace the back gable and the flat roof. This timely appeal followed.
 

 LAW AND DISCUSSION
 

 On appeal, appellant contends the trial court erred in awarding damages because (1) the appellees have enjoyed uninterrupted beneficial use of the contractor’s work, (2) the appellees suffered no damages by anything appellant did or did not do, and (3) that the trial judge substituted his own experience to find the workmanship on the contract was defective. We disagree and find the record supports the trial court’s judgment.
 

 LSA-C.C. art. 2769 states that if an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract. Under this article, a building owner seeking to recover damages from a construction contractor for defects, bears the burden of proving: (1) both the existence and nature of the defects; (2) that the defects were due to faulty materials or workmanship; and (3) the cost of repairing the defects. |
 
 9Mount Mariah Baptist Church, Inc. v. Pannell’s Associated Electric, Inc.,
 
 36,361 (La.App. 2 Cir. 12/20/02), 835 So.2d 880.
 

 Ms. Fantazia testified that the roof leaked after the installation and after the two occasions where representatives of Landrieu Brothers attempted to repair the leaks. While she was not sure if the roof was leaking at the time of trial, her expert, Mr. Vicknair, testified that the roof was leaking and the water was running down the back wall, which is why the leak was not visible. Mr. Vicknair further testified that the roof was not properly installed due to the rubber roid not being properly torched and the shingles not being properly placed. The pictures introduced into evidence clearly showed the edges of the roof were curling up and the flat roof was wavy preventing the roof from draining properly. Additionally, the trial court obviously credited the testimony of Mr. Vick-nair over that of Mr. Landrieu regarding the improper installation of shingles over flashing in the area where the slope roof transitions to the flat roof. Thus, based on the testimony presented by Ms. Fantazia and Mr. Vicknair, as well as the pictures introduced into evidence, appellees carried their burden of proving the existence of defects and that the defects were due to faulty workmanship.
 

 Appellant’s contention that appellee suffered no damages due to the defects in the roof is without merit. Mr. Vicknair
 
 *44
 
 explained that the improper installation caused the manufacturer’s warranty to be void. The improper installation would prevent the homeowner’s insurance coverage for any future wind damage since the shingles were not properly installed. Furthermore, Mr. Vicknair testified that the roof was leaking which would lead to wood rot creating a condition described as a “termite trap.”
 

 Likewise, we find no merit to the appellant’s contention that the trial judge substituted his experience when the record indicates otherwise. The trial judge Instated that he had not had any work performed by Mr. Vicknair or by Landrieu Brothers. His statement that flashing is supposed to be placed under shingles is supported by Mr. Vicknair’s testimony.
 

 With regard to costs, Mr. Vicknair testified that it would cost $12,300.00 to replace this roof. Appellees have answered this appeal seeking an increase in the damage award from $6,000.00 to $10,700.00, the contract price. Mr. Vick-nair testified that the front gable was installed properly. Thus, the entire roof did not have to be replaced. A review of the diagram of the roof indicates approximately 50% of the roof had to be replaced due to defects resulting from appellant’s poor workmanship. The $6000.00 award represents approximately 50% of the contract price. Additionally, appellee’s expert testified that it would cost $12,300.00 to replace the entire roof and $6,000.00 is nearly half of that amount. Thus, we see no error in the award.
 

 CONCLUSION
 

 For the foregoing reasons, the judgment from the trial court is affirmed.
 

 AFFIRMED.